## Case No. 12,583.

### SEAMANS v. LORING et al.

[1 Mason, 127.] 1

Circuit Court, D. Massachusetts. Oct. Term, 1816.

MARINE INSURANCE — TIME POLICY ATTACHES — PRIOR INSURANCES—CHANGE OF NATIONAL CHARACTER—DELAY.

1. In a policy at and from a port, the construction of it, as to the time when the policy attaches, depends on circumstances. If the vessel be in a foreign port, in the course of a voyage, it attaches from her first arrival there. If in a domestic port, then from the date of the policy. If the vessel has been long lying in port, without reference to any particular voyage, there it attaches from the time preparations are begun to be made for the voyage insured. If the assured becomes owner while the vessel is lying in port, the policy does not attach until after his ownership commences.

[Cited in Henshaw v. Mutual Safety Ins. Co., Case No. 6,387; Merchants' Mut. Ins. Co. v. Baring, 20 Wall. (87 U. S.) 163.]

2. If a policy be for A B, or whom it may concern, and made by an agent without any warranty, or representation of national character, it will cover the interest of any person, whether an American or foreigner, who has authorized the insurance. By a policy on vessel and cargo, a party having a lien for advances, or a special ownership and possession, may protect his interest in the vessel and cargo, to the extent of his advances and lien. By the usual clause in policies, as to prior insurances, the underwriter is exonerated, if prior insurances to the full value of the vessel and cargo, have been actually made by the assured on the same voyage, and in full force at the time, although by a subsequent agreement between the assured and such prior underwriters, before the risk is commenced, the prior policies are cancelled.

[Cited in Hancox v. Fishing Ins. Co., Case No. 6,013; Aldrich v. Equitable Safety Ins. Co., Id. 155.]

[Cited in Grant v. Wood, 1 Zabr. (21 N. J. Law) 292; Ryder v. Phœnix Ins. Co., 98 Mass. 192; Kent v. Manufacturers' Ins. Co., 35 Mass. (18 Pick.) 22.]

3. It seems that if a vessel be described in the policy to be a prize vessel, and afterwards her national character be changed, so as to increase the risk, this discharges the underwriters.

4. If, in a policy "at and from," the assured unreasonably delay to commence the risk, or the voyage, the underwriter is discharged. It amounts to a non-inception of the voyage insured.

[Cited in Snyder v. Atlantic Mut. Ins. Co., 95 N. Y. 202.]

---

1 [Reported by William P. Mason, Esq.]

[5. Cited in Folsom v. Merchants' Mut. Mar. Ins. Co., 38 Me. 417, and in Jordan v. James, 5 Ohio, 99, to the point that a lien may be acquired for advances by a mere possession under a contract for that purpose, but that it is of the very essence of the lien that possession accompanies it.]

This was an action brought by the plaintiff [Young Seamans], as indorsee of the executors, &c. of Amos M. Atwell, an insurance broker, to recover a premium note signed by the defendants [Caleb Loring and others], and dated the 7th of February, 1814, for the sum of $1,401, payable to the said Atwell, or order, in ninety days after date. The cause was tried upon the general issue, when the following facts appeared:—The policy, for which the premium note was given, was underwritten in the office kept by Mr. Atwell, at Providence, in Rhode Island, on the 7th day of February, 1814. By the policy, "Messrs. Loring and Curtis, of Boston, for Leonard Jarvis, the 3d, or whom it may concern, do make insurance, and cause him or them to be insured, lost or not lost, arrived or not arrived, the sum of $2,800, on the brig Fame and appurtenances, and on her cargo on board, at and from Bergen, in Norway, to Boston, or a port of discharge in the United States, and until the cargo is safely landed. The brig Fame was an English vessel, captured by a privateer and sent into Norway, and it is not known whether she has been condemned as prize or not; in case of loss, payable to said Loring and Curtis only, or their order, whereof is master for this present voyage Justus B. Lockwood, or whoever else shall go master in the said vessel, &c. beginning the adventure upon the said brig Fame, appurtenances, and cargo, at Bergen as aforesaid, &c." In the margin, the insurance was declared to be on vessel $600, and on cargo $2,200. The premium fifty per cent. At the close of the policy was the following clause: "And it is the express condition of this policy, that the subscribers hereto shall be discharged from every risk, in case the same property should be wholly assured by any policy, or policies, actually prior to this. But should any part of the same property remain unassured by such prior policy, or policies, or if the sum, assured by this policy, should exceed the true value of the property at risk, then the first subscribers hereto, and those next in succession, shall be held to bear and take the risk of the sum written by each respectively, until the real amount of the property at risk shall be fully assured, and the subsequent subscribers to this, and policies of a later date, shall be discharged from every risk. But every subscriber, though discharged from the risk, shall be entitled to one half per centum on the sum written by him. But in all cases of return premium, one half per cent. to be retained by the assurers."

The insurance was effected under the following circumstances:—Mr. Leonard Jarvis had, in his hands, funds belonging to the defendants, which he was desirous of remitting to the United States, but not finding any con-

venient mode, he entered into a negotiation with Mr. Preble, of Paris, whereby he agreed to advance him 100,000 francs, and take his bills of exchange, endorsed by Mr. Daniel Parker, of Paris, and drawn on the defendants, for the amount. Mr. Preble was, at that time, owner of the privateer True-Blooded Yankee, which had sent several prizes into Bergen, in Norway, and among others, the brig Fame and cargo; and it was agreed, that the said brig and cargo should be sent to Boston, under the control of Jarvis, and in his name consigned to the defendants, who were, out of the proceeds, to pay the amount of the bills so drawn on them. Mr. Jarvis, by a letter dated Paris, November 10th, 1813, wrote the defendants, giving them information of this negotiation, and in his letter are the following paragraphs:—"Mr. Preble has, in Norway, at his disposition, about 150,000 yards of Irish linen, and 1,200 yards of table linen, together with a fine brig of 200 tons, prize to the privateer, to which he is agent. I have agreed to advance him 100,000 francs, upon the following conditions:—1st. That I should have the entire control over it, and expedite it to Boston in my name, as security for the advance I made, consigning it to you, and giving you orders for the insurance, covering the amount. At foot you will find note for insurance, that you will not fail to have effected, as Preble would by no means be uncovered." Note for insurance: "Thirty thousand dollars, covering the premium, on brig Fame and cargo, at and from the port of Bergen in Norway, to that of Boston in America, warranted to sail during the winter, for account and risk of Leonard Jarvis, 3d. If you can leave out the warranty, without much affecting the rate of premium, it would be better." The defendants applied to Mr. Atwell to procure the insurance, by a letter dated on the 1st of February, 1814, and in that letter they stated the commendations, bestowed by Mr. Jarvis upon Captain Justus Lockwood, who was to be the master for the voyage, and upon the vessel; and among other things, that it "is expected she will sail about the 1st of January, so that we may look for her in all February. Her cargo will consist of linens; the vessel was captured, we believe, by the True-Blooded Yankee." The letter further stated the form of the policies underwritten upon the same vessel and cargo, for the same voyage, in Boston, and then adds: "We have effected upwards of $37,000, at the public and private offices;" and afterwards: "We may wish to have $23,000 done, instead of $15,000, if you can effect it." In another letter of the defendants to Mr. Atwell, dated the 5th of February, they state, (and give the particulars) that $41,000, had then been underwritten in Boston and Salem. Between the date of this letter, and the effecting of the policy at Providence, there was an additional sum underwritten on the prior policies, so that on the 7th of February, 1814, those policies, which were on the same voyage, and precisely in the

same terms with the Providence policy, covered, in the aggregate, the sum of $43,700, on vessel and cargo, viz. $9,190, on the vessel, and $34,510, on the cargo.

The brig Fame arrived at Bergen, in Norway, in March, 1813, and her cargo was immediately taken out and put into the government stores. As soon as the negotiation between Messrs. Jarvis and Preble was completed, in November, 1813, Captain Lockwood was despatched by them from Paris to Bergen, and he received orders, before his departure, from Mr. Preble, to sell the brig and cargo at public sale, payable in undoubted bills on Paris, and that if Mr. Jarvis should instruct him to purchase the brig, and about 151,000 yards of linen, he (Lockwood) might draw on Mr. Preble for the amount. Accordingly Mr. Jarvis did so instruct Lockwood to purchase the brig and linens, and draw on Mr. Preble, as had in fact been previously arranged between himself and Mr. Preble. Mr. Lockwood was farther instructed, that if he purchased the brig and linens for Mr. Jarvis, to put her under American colors, take the command of her as master, ship said linen on board, with a sufficient quantity of iron to ballast her, and proceed to Boston, and there deliver the vessel and cargo to the defendants. Mr. Lockwood did not arrive in Bergen until April, 1814, when he found the brig stripped, and moored in one of the outer harbours of Bergen. The linens were then in Mr. Janson's store, under the seal of the government, who refused to permit the brig to leave the port, and either the brig or linens to be sold. Some time afterwards liberty was obtained from the government to sell the white linens, and accordingly they were sold by public auction, and generally bought in by Captain Lockwood, for the account of Mr. Jarvis; and finding the prices good, he proceeded to sell the same linens by retail. The government, however, still withheld the brown linens, asserting that they were wanted for the use of their soldiers. Mr. Jarvis, having received information of these facts, in the autumn of 1814 made a direct contract with Mr. Preble for the sale of the vessel and cargo, and determined immediately to proceed to Bergen. Accordingly Mr. Preble, in October, 1814, executed a bill of sale of the brig to Mr. Jarvis; and sent directions to his agents, at Bergen, to deliver over the cargo to him, and to account with him for the proceeds already sold. In November, 1814, Mr. Jarvis arrived in Bergen, and there found Captain Lockwood selling the white linens by retail at a good price, and engaged in negotiation with the government respecting the price to be paid by them for the brown linens, which were still in the stores, under the government seals. Mr. Jarvis, being about to return to Paris, gave instructions to Captain Lockwood, to have the brown linens sold by public auction, and bought in on his account, in the same manner that the white linens had been (which, it was stated, could have been procured to be done, by a little management with the officers of the

government); and to sell the same by retail, unless the whole could be sold at an advantageous price. But, just on the eve of his departure, the negotiation with the government was completed; and they agreed to purchase the brown linens at a great price; and Mr. Jarvis ratified the sale. At this time, all further thoughts of performing the original voyage to Boston, were laid aside. Mr. Jarvis returned to Paris, and again returned to Bergen, in March, 1815. In the mean time the government had, by the intervening peace, become dissatisfied with their bargain, and finally agreed to return the brown linens to Mr. Jarvis, and to pay him £1,000 sterling, as a remuneration for his loss. The proposal was accepted; and the brown linens were accordingly restored. Mr. Jarvis then directed the brig and brown linens to be sold by public auction, with a view to change the apparent property, and they were accordingly sold; and the brig, and a great part of the linens, were purchased upon his account, by a Mr. Hans Reimer of Bergen. The brig was then put under Swedish colors, her name changed to the Waren, and she had a Norwegian register and other documents, and a Norwegian master and crew. Mr. Jarvis, at first, intended to send the brig, with the residue of the linens, to France; but the return of Bonaparte from Elba, induced him to give up this voyage. He next projected a voyage to the West Indies, and finally determined to send the vessel to the United States. Accordingly the remaining linens were, in the latter part of May, 1815, put on board of the brig, documented as a Swedish vessel. She sailed on the voyage about the 22d of June, and arrived in Boston in August, 1815. The cargo was stated, in the invoice, to be shipped by Mr. Jarvis, on account and risk of Messrs. Loring and Curtis, and consigned to them. The invoice value of the cargo, (which was sworn to be the true value) was $16,258.16, and the value of the vessel $2,862, to cover which, at fifty per cent. premium, would require double the amount, viz. $5,724 on the vessel, and $32,516 on the cargo, in the whole $38,240.32.

In consequence of information received, by the defendants from Mr. Jarvis, of the state of the property, the defendants, between the 20th and 24th of December, 1814, procured a memorandum to be underwritten upon eight of the policies, which covered the sum of $28,300, in substance as follows: "It is agreed, that the delay in the sailing of the Fame from Bergen, shall not be considered as a deviation, the assured warranting, that she shall sail for the United States on or before the first day of February, 1815. The assured also warrant, that the goods were sound at the time of the shipment. If the Fame does not sail before the second day of February, and the risk ends without a loss, the whole premium is to be returned, excepting a reasonable compensation for the risk which shall have accrued." These policies were afterwards cancelled upon payment of one half per cent. All the other policies were also cancelled in March and April, 1815, except the Providence policy, upon the payment of one half per cent. The underwriters on the policy, at Providence, were applied to for the purpose of agreeing to a like memorandum; but they declined inserting it.

Upon this evidence, the following points were made by Hubbard & Prescott, for defendants: 1st. That by the policies, prior to the Providence policy, there was an insurance to a greater amount, than the whole property at risk. 2dly. That the policy never attached; because there never was any fitting out of the vessel upon the voyage originally insured, the delay amounting to a deviation from the voyage. 3dly. That the policy never attached; because the insured had no interest in the vessel or cargo, at the time of underwriting the policy, but acquired it afterwards, in October, 1814, and not before. 4thly. That the policy never attached on the vessel; because she was altered from a prize vessel to a Norwegian, before the risk began, which materially increased the risk.

Mr. Townsend, for plaintiff, on the other hand, contended, that there was no over-insurance; the property being grossly undervalued in the evidence offered by the defendants, and the markets at Bergen affording no standard of its real value. 2dly. That if the value were as stated by the defendants, still as the prior policies were, by the memorandum and agreement of the parties, cancelled or varied, so that they never attached upon the property insured, they were to be considered as if they never had existed, and, consequently, there was sufficient property to be covered by the Providence policy. 3dly. That the policy, in this case, being "for whom it may concern," covered not only the property of Mr. Jarvis, but also that of Mr. Preble, who, as prize owner and prize agent, had a right to cause insurance to be made. 1 Marsh. Ins. (Condy's Ed.) 97, 108, 112, 113; Hill v. Secretan, 1 Bos. & P. 315. 4thly. That Mr. Jarvis had a complete property in the vessel and cargo, by virtue of the contract with Preble, in October, 1813, and that the subsequent sale was but a ratification of it. 5thly. That the policy being "at and from," attached upon the Fame and cargo at her first arrival at Bergen, in March, 1813; and that the subsequent seizure and detention thereof by the government would have justified an abandonment for a total loss. 1 Marsh. Ins. 288, 262, 289; Hull v. Cooper, 14 East. 479; Bell v. Bell, 2 Camp. 475; Smith v. Steinback, 2 Caines. Cas. 158.

In reply to the plaintiff's points, Prescott & Hubbard contended: 1st. That a prize agent had not, as such, any right to insure; and, they said, it had never been so adjudged, and that the opinion in 3 Bos. & P. 75, was a mere obiter dictum. 2dly. That the defendants had no authority to insure for Preble, but only for Jarvis. 3dly. That if an agent insure, he must insure as such, in the policy. French v. Backhouse, 5 Burrows, 2727; 1 Marsh. Ins. (Condy's

Ed.) 297. 4thly. That Jarvis had no insurable interest under the contract, in November, 1813, and that he had not even a lien on the property, for it was not then put into his possession. 5thly. That by the words "at and from," the policy did not attach upon the first arrival of the Fame at Bergen, but only from the time that some act was done towards fitting her for the voyage to Boston. 1 Marsh. Ins. (Condy's Ed.) 261; Kemble v. Bowne, 1 Caines, 75, 79.

STORY, Circuit Justice (after stating the facts). The first question is, whose interest is assured by the terms of the policy? The policy was effected by Messrs. Loring and Curtis, for Leonard Jarvis, 3d, or whom the same "may concern." It will, therefore, by its terms cover the interest of L. Jarvis, or any other person, having an interest in the vessel and cargo, who has given an authority for such insurance. There is no warranty or representation of an American character, and the insurance may avail for any foreigner, who has authorized it to be made on his own account. Hodgson v. Marine Ins. Co., 5 Cranch [9 U. S.] 100. But the insurance cannot enure in favor of any person, who had an interest in the cargo, unless Messrs. Loring and Curtis had an authority from him for that purpose. Steinback v. Rhinelander, 3 Johns. Cas. 269. The letter of instructions, under which this insurance was effected, is now before us, and the construction of it is a question of law. I am of opinion, that it authorized an insurance to be made for L. Jarvis only; and that an insurance for the captors, or for Mr. Preble, was not authorized by it. There is nothing in the letter, which imports, that L. Jarvis is acting as agent for the captors, or for Mr. Preble, in making the insurance. On the contrary, he speaks in reference to an interest, which he had acquired in the vessel and cargo, by virtue of advances, made upon the credit of that fund. And the language in the close of the letter is perfectly satisfied by the obvious interest, that Mr. Preble had, in having an insurance made by Jarvis to the amount of his interest, without supposing that he authorized any insurance directly on his own account. And in respect of proof of an authority to make insurance, I think, that it should not be gathered from loose expressions or inferences in letters of third persons; but it should distinctly appear in some communication between the parties, or their indisputable agents. Assuming, therefore, that a mere prize agent, as such, has, without any special authority for that purpose, a right to insure for the benefit of the captors (Le Cras v. Hughes, 1 Marsh. Ins. 84, 108; Craufurd v. Hunter, 8 Term R. 13; Lucena v. Craufurd, 3 Bos. & P. 75, 2 Bos. & P. N. R. 323, and 1 Taunt. 325; Stirling v. Vaughan, 2 Camp. 225; Routh v. Thompson, 11 East, 428), still as that insurance does not appear to have been authorized by such agent, it cannot avail for the captors.

It is argued, that the words "whom it may concern" have no effect, unless they are made to recover the interest of Mr. Preble. If that were true, and they were thus to be deemed mere surplusage, it would not vary the legal result. But, in this policy, the words seem to me to have an appropriate use. Under all the circumstances of this case, as the advances were made to Mr. Preble out of the funds of Messrs. Loring and Curtis, by Jarvis, as their agent, by adopting his acts, and making the insurance, it might be, that thereby the interest, whatever it was, that was acquired under the contract, between Preble and Jarvis, might be deemed to be theirs and not Jarvis's. In this view, it might have been a moot point (if the policy had been for Jarvis only) whether he had an interest, to which it could attach; and therefore the words "for whom it may concern" were properly added to cure a doubt; and they are sufficient to cover any interest of Messrs. Loring and Curtis in the vessel and cargo.

The next consideration respects the nature of the interest, covered by the policy. It is on "the brig Fame and her cargo on board." It can, therefore, cover no interest except in the vessel and cargo; and the question is, whether Jarvis, or Messrs. Loring and Curtis, were the owners of the vessel and cargo, or of any interest therein. The original contract between Preble and Jarvis certainly was not intended to convey the general ownership, even admitting that Preble was the entire owner of the vessel and cargo; which is certainly not in proof, but, for the purposes of this trial, seems conceded by the parties. That contract was, that the vessel should be put under the control and management of Jarvis, and consigned to Loring and Curtis; and out of the proceeds of the sale, after her arrival in the United States, they were to pay a bill of exchange, drawn upon them, for their own use. The surplus was to be for the benefit of Preble, or the captors. The utmost interest then, intended in the first instance to be conveyed, was a lien on the vessel and cargo, to the extent of the advances made by Jarvis. To pass the title to a vessel, it is indispensable, that there should be some written transfer of the vessel. This is required by the law of nations, as well as the municipal law of this country. A vessel will not pass by a mere delivery, without a document of sale. The latter is considered as an indispensable muniment of title. The Sisters, 5 C. Rob. Adm. 155; Abb. Shipp. p. 1, c. 1. And I think, that a lien for general advances cannot be acquired, unless by an hypothecation or other conveyance in writing for this purpose. And if it were otherwise, it is clear, that the lien could not be complete, having a situs in re, until possession was acquired under the contract. I should hold, therefore, that no ownership in the vessel was acquired, until the bill of sale to Jarvis in October, 1814, if it were necessary to rest this cause on that point. But it may well be disposed of, even assuming the more

favorable position for the plaintiff, that an interest was acquired, as soon as the contract for advances was consummated by an actual possession by Captain Lockwood, in April, 1814.

As to the cargo, a different consideration may, in some respects, prevail. The title may pass by mere delivery of the goods under a contract of sale; or a lien may be acquired for advances by mere possession under a contract for that purpose. But it is of the very essence of a lien on goods, that possession accompanies it. The contract in October, 1813, was clearly executory, both as to vessel and cargo. It was contemplated by the parties, that the interest of Jarvis was to be acquired under a public sale at Bergen of the vessel and cargo, which were to be bought in on his account, and conveyances were to be made to him. Until such conveyances, he was not deemed to be the ostensible owner, nor his control of the vessel complete. And the subsequent agreement and sale, in November, 1814, is perfectly consistent with this construction of the original contract. If, therefore, Jarvis did acquire a lien on the vessel and cargo under the contract for advances, followed up by possession, I think, that he may be rightfully considered as the special owner of them to the extent of these advances; and as such might protect himself by an insurance to that extent. Russel v. Union Ins. Co., 4 Dall. [4 U. S.] 421.

The next question is, at what time, if ever, did the policy attach? The insurance is, "at and from," &c. What is the true construction of these words in policies, must, in some measure, depend upon the state of things, and the situation of the parties, at the time of underwriting the policy. If at that time the vessel is abroad in a foreign port, or expected to arrive at such port in the course of a voyage, the policy by the word "at" will attach upon the vessel and cargo from the time of her arrival at such port. Smith v. Steinback, 2 Caines, Cas. 158; Garrigues v. Coxe, 1 Bin. 592; Chitty v. Selwyn, 2 Atk. 359; Camden v. Cowley, 1 W. Bl. 417; 1 Marsh. Ins. 262; Bird v. Appleton, 8 Term R. 562; Bell v. Bell, 2 Camp. 475; Hull v. Cooper, 14 East, 479; Horneyer v. Lushington, 15 East, 46; Annen v. Woodman, 3 Taunt. 299; Patrick v. Ludlow, 3 Johns. Cas. 10. If, on the other hand, the vessel has been a long time in such port without reference to any particular voyage, the policy will attach only from the time, that preparations are begun to be made with reference to the voyage insured. Kemble v. Bowne, 1 Caines, 75, 79; Chitty v. Selwyn, 2 Atk. 359; Gladstone v. Clay, 1 Maule & S. 418. And if the party insured acquired the ownership subsequent to such time, and before the date of his policy, then the policy will attach only from the time of his acquiring such ownership. If, on the other hand, the ship is at a home port at the time of effecting such insurance, the policy seems generally to be deemed to attach only from the date of the policy. Forbes v. Wilson, 1 Marsh. Ins. 155,

261; Smith v. Steinback, 2 Caines, Cas. 158. In all these cases, the law looks to the known and admitted predicament of the parties at the time of the insurance, and construes the contract with reference to such facts. And a uniform construction of the words, without reference to such circumstances, would often produce the most incongruous and mischievous results.

In the present case, the vessel was in a foreign port, not in the course of a voyage, but moored and stripped, without any destination for any particular voyage. She arrived at that port in March, 1813, and her cargo was about that time unladen. The captors, or their agents, had not, at that time, nor at any other time before the contract with Mr. Jarvis in December, 1813, the slightest intention of undertaking a voyage to Boston. If this policy then were construed to attach from the moment of the first arrival of the Fame at Bergen, it would wholly defeat the intention of all the parties to this insurance. The captors or their agents never authorized any such insurance upon their own account; and it would, therefore, be a mere nullity. Neither Mr. Jarvis, nor Messrs. Loring and Curtis had, at that time, acquired any interest in the property; and the assured must have a subsisting interest at the time when the policy, by its terms, would attach, otherwise it will be void for want of an insurable interest. Such an interest, subsequently acquired, would not aid them. And it may be added, that there would have been such a concealment of material facts, whether innocently or otherwise is not important, that the underwriters would have been completely discharged. My opinion is, that under the circumstances, this policy, by its terms, did not attach at the arrival of the Fame at Bergen; that it could not attach on the vessel, earlier than the period, in which the assured acquired the special or general ownership of the vessel; nor, if that was previous to the effecting of the policy, until some act was done, or preparation made, with reference to the voyage. If the ownership was acquired subsequently to the date of the insurance, and before preparations for a voyage, the same rule will apply. If while preparations were making for the voyage, the policy will attach only from the time of acquiring the ownership. And in these cases it is always an important inquiry, whether there has been a concealment of facts material to the risk, or a delay in acquiring the ownership, or in preparing for, and sailing on, the voyage, which ought to discharge the underwriter. As to the cargo, it is clear from the terms of the policy, that the policy could not attach on it, until it was actually put on board for the voyage. The word "cargo," ex vi termini, means goods on board of the vessel; and in this policy, it is not even on "cargo" generally, but on "cargo on board."

We may now apply these principles to the facts of this case. Assuming that the ownership of the vessel was acquired in April, 1814,

by the possession of Captain Lockwood, the policy did not immediately attach on the vessel, but only from the time when preparations were made for the voyage. It is clear from the evidence, that no such preparations were made by Captain Lockwood on his arrival at Bergen. He then found the cargo under the seals of the government; and they refused to allow the cargo to be put on board the vessel, or the vessel to depart from the port. No sale of the vessel was ever made by him, by public auction, so as to constitute Mr. Jarvis the ostensible owner; and, in the autumn of 1814, having obtained leave, he sold the white linens by public auction, and bought them in for Mr. Jarvis, and then proceeded to sell them on his account by retail. When Mr. Jarvis arrived at Bergen, in November, 1814, he confirmed these acts of Lockwood, ratified the sale of the brown linens to the government, and totally abandoned all further thoughts of the voyage. The very substratum of the voyage, the whole cargo of linens, was voluntarily disposed of; and it was not until his second return to Bergen, in March, 1815, when the brown linens were returned by the government, and after having two other voyages in view, that Mr. Jarvis concluded to resume the original voyage to Boston. Preparations for this purpose were made in May, 1815, and the cargo was then, for the first time, put on board. Under these circumstances, the policy did not attach on vessel, or cargo, until that time. There is no pretence, that this delay was justified by necessity; and therefore the underwriters could not have been held under the policy. In fact, as to them, there was a complete non-inception of the voyage insured. It was not a deviation, for that supposes the voyage to have commenced. But there was a delay, which, to all intents and purposes, made the voyage a new one, which they never had insured. The very representation, under which they had underwritten, was of a voyage immediately to be performed, and not of a voyage to commence in futuro, at any period when it might suit the convenience of the assured to prosecute it.

But there is another point, which, if the evidence be believed, and it is exceedingly strong, and, as far as I recollect, perfectly uncontradicted, completely disposes of the cause, let the other points be as they may. It is the point, that there was an over-insurance before the date of the present policy, the whole interest being, as it is asserted, but $38,240.32, and the whole prior insurance being $43,700. If the jury are satisfied, that such is the fact, then it is my opinion, that the present policy never attached, for want of a subject matter, upon which it could operate, notwithstanding the prior policies were cancelled or defunct, before the risk commenced.

The prior policies were all underwritten upon the same voyage, and in the same terms; their priority, therefore, was according to their respective dates, and nothing done by the parties to those policies, after the execution of the present policy, could alter the relative situation of the parties to this policy. The rights of the latter were fixed by the terms of their own contract. The memorandum, therefore, entered upon the prior policies in December, 1814, by which those policies, from non-compliance with the warranty, were discharged on the second day of February, 1815, before the risk commenced, has no effect upon the present policy. And, as between the parties in the present suit, those policies are to be considered in the same manner, as if no such memorandum or cancellation had ever been made. It is not competent for the assured thus to change the legal predicament of the underwriters on a policy. The clause in this policy, referring to the effect of prior policies, is perfectly unambiguous in its terms. When it speaks of the property's being assured by policies "actually prior to this" policy, it speaks with reference to such policies, as subsisted at the real date of this policy. It does not refer to any subsequent acts or agreements between the parties, by which those policies might, or might not, attach upon the subject matter. If the property, which the assured has in the subject matter of insurance, would be completely covered by those policies, supposing them still in existence, it is quite immaterial to the subsequent underwriters, whether the assured choose to hold or release those policies. The language of the clause, as to subsequent insurers, manifestly refers their responsibility to the date of their policies, and confirms the construction, which has been stated. Upon any other construction great inconveniences and even frauds might arise; and in case of a subsequent increase of risk, there would be great temptations for prior underwriters to collude with the assured, and discharge themselves, and charge the subsequent insurers. All that is required by the terms of the contract is, that the property should be wholly assured by a prior insurance for the same voyage. But whether that insurance ultimately protects the party, or not, is a question, with which the contract does not at all intermeddle.

I do not think it necessary, considering the predicament of this case, to press another point, which has been made at the argument. From the terms of the policy, the vessel is warranted to be an English prize vessel; and if, by changing her colors and documents, and giving her a Swedish character, before the policy attached, the risk was materially increased, the underwriters were completely discharged.

The jury found a verdict for the defendants.

After the verdict, Mr. Townsend, for plaintiff, moved for a new trial on account of a misdirection of the court upon the point, as to the effect of the memorandum upon, and cancellation of, the prior policies. He argued, that the prior policies were by the memorandum and subsequent non-compliance with the warranty contained therein, completely removed on the second day of February, 1815, long before this policy, according to the con-

struction given by the court, attached either to vessel or cargo. Under these circumstances, the case was the same, as if those policies had never been underwritten. The clause in the policy, as to prior insurances, refers only to insurances "actually prior," where the risk shall have actually attached, and not to the date of the policy. If the risk has not commenced, the prior policies may at any time be removed, and the subsequent policies will attach, as if there had not been any others in existence. The terms "actually prior" mean, not actually prior in point of time, but in attaching upon the subject matter.

Prescott & Hubbard, for defendants contended, that the construction, put upon the clause by the court, was the correct one. Great inconveniences and frauds would arise upon any other construction. This clause was first introduced about thirty years ago, in consequence of the adoption of the English rule as to contribution, in a case in which Mr. Cabot was a party. The construction has uniformly been, that the priority is from the real dates of the policies; and it would be strange indeed, if the acts of third persons should vary the legal predicament of the parties.

STORY, Circuit Justice. I remain of the same opinion, which was expressed at the trial, upon the point now in question. Every subsequent reflection has confirmed me in the belief of the correctness of that opinion. There is no case in the books, in which this point has come solemnly in judgment; but it seems to have been taken for granted in various discussions of courts of law, that the construction for which we contend, was the true one. Mr. Justice Kent has sufficiently stated the true meaning of the clause. New York Ins. Co. v. Thomas, 3 Johns. Cas. 1. An insurance, prior in date, is to exonerate the underwriter, and entitle the assured to a return of premium; an insurance, subsequent in date, is to have no effect at all upon the present policy. Lee v. Massachusetts F. & M. Ins. Co., 6 Mass. 208; Brown v. Hartford Ins. Co., 3 Day, 58.

On the whole, the district judge concurs with me in the opinion, that the motion for a new trial must be overruled. Motion overruled.