THOMAS MACY & another *vs.* THE WHALING INSURANCE
COMPANY.

When underwriters insure the cargo and catchings on board a ship, on a whaling voyage,
a letter seasonably written to them by the assured, informing them that the ship is
lost by stranding, and tendering an abandonment to them of the interest in the cargo,
so far as it has been insured by them, is such an abandonment as entitles the assured
to recover for a total loss, if such loss is sustained.

A provision, in a policy of insurance on cargo and catchings, that, if the assured shall
have made any prior insurance on the catchings, the underwriters shall be answerable
only for so much as the amount of the prior insurance is deficient towards fully cov-
ering the property at risk, remains in force after a prior policy, effecting such insur-
ance, is cancelled by agreement of the parties thereto, without the consent of the
latter underwriters, although it is cancelled before any loss occurs.

Evidence is admissible to prove a usage, among owners of whale ships and underwriters,
to treat a policy of insurance on outfits as covering one quarter part of the catchings.

THIS was an action of assumpsit, pending in the county of
Nantucket, upon a policy of insurance, No. 574, bearing date
January 29th 1842, by which the defendants caused the
plaintiffs " to be insured, lost or not lost, $10·000 on the
cargo and catchings on board the ship Orbit; on a whaling
voyage in the Pacific Ocean, or wherever she may cruise for
or obtain whales, and until her return to Nantucket; com-
mencing risk May 1st 1841." The policy contained the fol-
lowing clause : " It is hereby agreed that, if the insured shall
have made any other insurance upon the catchings aforesaid,
prior in date to this policy, the said Insurance Company shall
be answerable only for so much as the amount of such prior
insurance may be deficient towards fully covering the prop-
erty at risk," &c.   The plaintiffs claimed for a total loss.

The parties submitted to the court the following statement
of facts:  The Orbit sailed from Nantucket, for the Pacific
Ocean and wherever she might cruise for whales, on the 11th
of August 1839.   On the morning of the 7th of June 1842,
she was stranded and totally lost, on the coast of Peru, near
the port of Payta.   Upon receiving intelligence of the disas-
ter, on the 10th of November 1842, the plaintiffs sent to the
agent of the defendants, at Nantucket, a communication as
follows :  " Nantucket, 11th mo. 10, 1842.   Frederick C. San-

ford, Esq. agent of the Whaling Insurance Company at New Bedford. Having received such information as leaves no doubt of the loss of our ship Orbit, on the 7th day of 6th month, 1842, on the coast of Peru, we hereby tender to said company our abandonment of the interest in the cargo of said ship, so far as it has been insured to us by a policy issued by said company, No. 574, and claim as for a total loss.

T. & P. Macy."

On the 1st of August 1839, the plaintiffs obtained insurance for $20·000 " on the ship Orbit and cargo, outfit and catchings, half on each, from Nantucket to the Pacific Ocean and elsewhere, on a whaling voyage, to continue during her stay and cruising, and till her return to Nantucket, with liberty," &c. by a policy issued by the Ocean Insurance Company in Boston. On the 20th of May 1842, this policy was cancelled, and the plaintiffs received a return of part of the premium ; but this was done without the knowledge of the present defendants. On the 7th of August 1839, the plaintiffs obtained insurance for $7500 on the ship Orbit, and $7500 on her outfits, for the same voyage, by a policy issued by the Suffolk Insurance Company at Boston.

If the evidence be admissible, (which the plaintiffs deny,) it is agreed that it is the usage among underwriters and owners of whale ships, to treat a policy of insurance on outfits as covering one quarter part of the catchings, and that, by the usage, the term "outfit" includes catchings, to the extent of one quarter of their amount ; this amount of catchings replacing and standing in lieu of outfits. It is also agreed, that if the custom shall be considered, by the court, admissible in evidence, and the plaintiffs, or their counsel, shall not be reasonably satisfied of it, that question shall be submitted to a jury.

On the 1st of May 1841, the Orbit had about 600 barrels of oil on board. After that time, and previously to the loss, she obtained 500 or 1000 more. If the parties shall not be able to agree upon the quantity on board at the time of the loss, it shall be determined by an auditor to be appointed by the court.

When the court shall have determined the true construction and effect of the foregoing policies, the case is to be sent to an auditor, to adjust the loss according to the principles established by the court; and judgment shall be rendered accordingly.

*C. G. Loring & Eliot,* for the plaintiffs. 1. The abandonment made by the plaintiffs is sufficient to entitle them to recover for a total loss. 2 Marsh. Ins. (3d ed.) 610. 2 Phil. Ins. (2d ed.) 394. *Columbian Ins. Co. v. Catlett,* 12 Wheat. 383. *Murray* v. *Hatch,* 6 Mass. 478. *Reynolds* v. *Ocean Ins. Co.* 22 Pick. 191. *Patapsco Ins. Co.* v. *Southgate,* 5 Pet. 604. No adjudged case warrants the dictum in 18 Pick. 93, that a claim for a total loss should be accompanied by a statement of the facts and circumstances, and grounds of the claim. The loss of a whaling ship is almost always a loss of the cargo; and therefore a statement of the loss of the ship as a cause of abandonment is sufficient. If it had turned out that the cargo was safe, the abandonment would have been of no avail. 2 Phil. Ins. (2d ed.) 415.

2. The prior insurance by the Ocean Company does not affect the plaintiffs' rights; because the policy was cancelled before the loss. This fact distinguishes the present case from that of *Seamans* v. *Loring,* 1 Mason, 127. In that case, too. it was a "condition" of the policy, that it should be vacated by prior insurance. Besides; that policy covered only the ship and outfits. Though cargo and catchings are mentioned, yet neither cargo nor catchings existed when the policy was effected; and the ship and outfits were sufficient to cover the sum insured. The insurance did not shift afterwards. Or if it did shift, when, and in what proportions? See *Hill* v. *Patten,* 8 East, 373. *Paddock* v. *Franklin Ins. Co.* 11 Pick. 230. 1 Phil. Ins. (2d ed.) 145.

The insurance of outfits by the Suffolk Company cannot be extended to the cargo; and if it can apply at all to catchings, it can cover only so much as would replace the outfits consumed; and this under an alleged usage.

3. But the alleged usage cannot be invoked into the case.

Outfits have as definite a meaning as ship, and that meaning cannot be varied by proof of usage. *Blackett* v. *Royal Exchange Assurance Co.* 2 Crompt. & Jerv. 244. *The Reeside,* 2 Sumner, 567. *Rogers* v. *Mechanics Ins. Co.* 1 Story R. 607. *Rankin* v. *American Ins. Co.* 1 Hall, 619. *Eager* v. *Atlas Ins. Co.* 14 Pick. 144. *Hall* v. *Ocean Ins. Co.* 21 Pick. 482. *Strong* v. *Bliss,* 6 Met. 393. 3 Phil. Ev. (4th Amer. ed.) 1415, 1463. In New Bedford policies, express provision is made that "outfits" shall include one quarter of the catchings, &c. This shows that it would not be so, if it were not so provided for in terms.

*C. P. Curtis,* (*Clifford* was with him,) for the defendants. 1. The plaintiffs cannot recover for a total loss, because their abandonment was insufficient. They stated only the loss of the ship. *Dickey* v. *New York Ins. Co.* 4 Cow. 222. *Suydam* v. *Marine Ins. Co.* 1 Johns. 190, and 2 Johns. 138. *Dorr* v. *N. England Marine Ins. Co.* 4 Mass. 230. *Peirce* v. *Ocean Ins. Co.* 18 Pick. 93. In the case cited for the plaintiffs from 12 Wheat. 383, the question as to the sufficiency of the abandonment seems not to have been decided.

2. The prior insurance by the Ocean Company is to be deducted from the plaintiffs' claim, by the explicit terms of the policy in suit; and *Seamans* v. *Loring,* 1 Mason, 127, is decisive on this point.

3. Evidence of the alleged usage is admissible. 1 Phil. Ins. (2d ed.) 43, *& seq. Clark* v. *United F. & M. Ins. Co.* 7 Mass. 369. *Bedford Ins. Co.* v. *Parker,* 2 Pick. 8, 9. *Columbian Ins. Co.* v. *Catlett,* 12 Wheat. 387. *Coit* v. *Commercial Ins. Co.* 7 Johns. 385. *Astor* v. *Union Ins. Co.* 7 Cow. 202. *Dow* v. *Whetten,* 8 Wend. 160. *Wadsworth* v. *Pacific Ins. Co.* 4 Wend. 33. *Scott* v. *Bourdillon,* 2 New Rep. 213. *Stewart* v. *Bell,* 5 Barn. & Ald. 238. *Houghton* v. *Gilbart,* 7 Car. & P. 701. *Clayton* v. *Gregson,* 4 Nev. & Man. 602. *Smith* v. *Wilson,* 3 Barn. & Adolph. 728.

HUBBARD, J. 1. The first question, upon which we are called to give an opinion, is as to the sufficiency of the abandonment. Intelligence of the loss was received by the plain-

tiffs about November 10th 1842, and immediately the plaintiffs sent to the agent of the defendants the following abandonment : " Having received such information as leaves no doubt of the loss of our ship Orbit, on the 7th day of 6th month 1842, on the coast of Peru, we hereby tender to said company our abandonment of the interest in the cargo of said ship, so far as it has been insured to us by a policy issued by said company, No. 574, and claim as for a total loss." It is contended that it is insufficient, as it states no loss or damage to the cargo, which is the subject insured ; that, although the ship was lost, *non constat* but what the cargo was saved and on its way to the owners.

An abandonment is necessary, in order to the recovery of a total loss, where a part of the subject insured remains and is of any value. This necessity arises from the nature of the contract, as one of indemnity ; for it would be manifestly unjust that the assured should recover the whole amount of the property insured, and yet be permitted to retain to his own use the part saved. The practice of abandonment is ancient, but whether it is coeval with the contract of insurance is uncertain. It probably arose with the practice of allowing a recovery of the whole amount of the value of the property insured on losses which were only constructively total. The right of abandonment does not appear to have been the subject of judicial decision prior to the time of Lord Hardwicke, in 1744. *Pringle* v. *Hartley,* 3 Atk. 195. And although important in its character, as it affects the rights of the parties and their interest in the thing saved, yet no form of abandonment has been adopted by underwriters and merchants, or prescribed by law ; nor has it been determined that it must necessarily be in writing. No form being given, and the instrument not requiring technical words, it is very clear that any words which directly, and in terms, abandon the property insured to the underwriters, in consequence of a loss by a peril insured against, are sufficient to comply with the provisions of the law. It is true that where the insured abandons distinctly for one cause, (as, for instance, upon a loss by

seizure or capture,) he cannot, by force of such abandonment, claim a total loss by perils of the sea, or by fire ; because the underwriters are entitled to know the cause of abandonment, that they may judge whether to accept or not. But when the insured makes his abandonment, and claims a total loss under the policy, without stating the cause of loss, but refers to the intelligence he has received, the abandonment will not be defective ; because the underwriter can call for the information upon which it is grounded, and time will be allowed for the purpose, before he would be required to decide as to his acceptance or refusal. See *Lovering* v. *Mer cantile Ins. Co.* 12 Pick. 348.

It is argued, in this case, that the abandonment only communicated the fact of the loss of the ship, saying nothing of the cargo, which was the subject of the insurance, and might have been in safety. It is true that such might have been the fact ; and in such an event the underwriter could not have been injured. For if no such loss had taken place, the underwriter would not have been bound by such abandonment ; because both the right to abandon and the fact of abandonment must exist together, in order to avail the assured ; though it has been held, even that where a previous notice was required, such notice should avail as a continuing abandonment, to take effect at the expiration of the prescribed time. *Columbian Ins. Co.* v. *Catlett,* 12 Wheat. 383.

In the case before us, the loss of the cargo might well have been inferred from the loss of the ship ; and the plaintiffs having, in form, abandoned their interest in the cargo insured by the defendants, with a reference to the intelligence received of the loss, we do not think there is that substantial informality, in not distinctly stating the loss of the cargo with that of the vessel, as to render the act of abandonment invalid.

2. The next question presented for our consideration respects the cancelling of the policy effected with the Ocean Insurance Company. Two reasons are advanced, why it cannot have any bearing on the claim made upon the defendants. 1st. Because it was cancelled prior to the loss of the

vessel and cargo.  2d.  Because the prior policy did not, at the time of loss, attach to the cargo of the Orbit, but only to the vessel and outfits.  But this second reason, we think, does not directly meet the true point under consideration.  It relates rather to the construction of the prior policy, than to the necessary effect of its cancellation.  Passing this over, therefore, we proceed to the first ground of objection, which distinctly raises the question in difference between the parties.

The clause in the policy on the subject of prior insurance is very significant.  The language is, " if the insured shall have made any other insurance upon the catchings aforesaid, prior in date to this policy, then the said Insurance Company shall be answerable only for so much as the amount of such prior insurance may be deficient towards fully covering the property at risk," &c.  If, then, a prior insurance exists, it so far makes a part of the contract between the parties, that, in the event of loss, the insured must first claim of the prior underwriters, and exhaust that policy, before he can resort to the second underwriters.  The subsequent insurers, in the event of loss, are interested in a recovery under the prior policy.  The risk they take is subordinate to it.  The writing of the first policy may have been the very cause of their entering into the contract and assuming the risk, both from their confidence in the judgment of the party taking it, and from the fact that they would stand only in the place of second insurers.  The prior policy thus existing is then a part of the new contract, so far as the insured and the new underwriters are concerned, and, being a part of it, cannot be cancelled without mutual consent.  It is throwing new responsibilities and burdens on the underwriters, which they never assumed, and makes them liable, and exposes them to injury, in the event of a partial loss, in circumstances under which they never contracted to pay ; and it is no answer, to say that the first policy is cancelled prior to the loss.  That does not affect the reasoning, nor does it continue the risk of the defendants in the same manner, and to the limited extent,

in which it existed prior to the cancellation.   The relations
of the parties are altered injuriously to the second under-
writers, without their consent, and the effect is not only to in-
crease the risk directly, but its tendency, if allowed, would be
to make the subsequent underwriters insurers of the solvency
of the prior ; because, on any misfortune happening to the
prior underwriters, by which their ability to pay losses should
be impaired or destroyed, the party would cancel his policy, to
enable him to resort to his subsequent insurers for losses for
which they would not be accountable in case of the continu-
ance of the prior policy.   The English courts, to which we
so often resort for principles to guide us in the determining of
questions on the law of insurance, do not give light on this
particular case.   They have not introduced similar clauses into
their insurance contracts.   By their policies, the several un-
derwriters are in the nature of co-insurers, and each is liable
to contribute a ratable proportion of the loss, either to the
assured or to the underwriter who pays more than his pro-
portion.   Yet the particular question, what would be the legal
bearing upon the other underwriters, in case of loss after a
cancellation of one of the policies, upon the same risk, prior
to the loss, does not appear to have arisen.   Only one case in
this country has been cited by the defendants — that of *Sea-
mans* v. *Loring*, 1 Mason, 127 ; and in that case, it is decided
that if prior policies, to the full value of the vessel and cargo,
shall have been made, and are in full force when the last pol-
icy is written, the underwriters on the last policy are exoner-
ated, although the prior policies shall be all cancelled by a sub-
sequent agreement between the underwriters and the assured,
and that, not only before a loss, but before the risk insured
had commenced.   It is attempted to distinguish that case from
the present, because it was there provided in terms, " and it
is the *express condition* of this policy that the subscribers here-
to shall be discharged from every risk, in case the same prop-
erty should be wholly assured by any policy or policies, actu-
ally prior to this."   But the decision of the court does not
turn upon the use of the terms " express condition," but upon

the nature of the contract between the parties; and it is very obvious that the reasons given for the opinion apply, with equal force, to the case at bar. That decision furnishes the authority of an adjudged case in favor of the position, that the cancelling of a prior policy on the same subject matter cannot affect or bind a subsequent underwriter, without his consent. Independently of authority, if the point were wholly new, we should not hesitate, in deciding upon principles important in the administration of insurance law, to come to the same result.

As between the parties to this suit, the policy effected by the plaintiffs at the Ocean Insurance office must be considered in full force, in ascertaining the loss to be borne by the defendants. And when that inquiry is proceeded in, the question will arise, whether the policy made by that company attached to the cargo or catchings.

3. The third question, and a more difficult one, which arises in this case, is, in what manner the loss shall be apportioned among the owners and underwriters; the owners standing in the place of the underwriters at the Ocean office.

The defendants contend that a usage exists among underwriters on whale ships, and their owners, to treat a policy of insurance on outfits as covering one quarter part of the catchings; and that, by the usage, the use of the term " outfits " includes catchings, to the extent of one quarter part of their amount; the same replacing and standing in lieu of outfits.

The subject is not without its difficulties; and this is true of most subjects connected with the usages of trade, till the usage becomes so well established as to form, with all persons thus engaged, a part of the admitted law of the trade. Usages become laws by their frequent repetition, their reasonableness, their adaptation to promote the interests of the parties engaged in the business to which they are applied, and by their common adoption in the community, among those interested. They are, indeed, the results of the sound common sense of practical minds engaged in the same business; each party, whether buyer or seller, giver or receiver, having

his own, as well as the common advantage in view. But when a question of usage is brought before a court, two in quiries are necessary ; the first, as to its nature and extent, and the second, as to its reasonableness. Because a usage, to be binding, must be known and general among those engaged in the business, and received as matter of course. And, to be enforced by law, it must be reasonable in its provisions. For though usages apparently unreasonable may have been so. long continued as to have acquired the force of law, yet the unreasonableness, now apparent, may have grown out of changes occurring after the usage was established. But however that may be, when the question is first presented, as to giving legal effect to a usage proved to exist, where its binding force, or proof of its admissibility, is denied by one of the parties to the suit, the court will not enforce it, or give it the sanction of law, unless it be reasonable and convenient, and adapted not only to increase facilities in trade, but to the promoting of just dealings in the intercourse between parties.

In regard to the principles that should govern in settling a question of usage, certain general axioms have been laid down by different judges, which are brought together in our text books, and to which a common assent has been yielded. As to written contracts, it has been held that usage is admissible to explain what is doubtful, but not to contradict that which is plain and free from ambiguity. Otherwise, the parties will be arbitrarily held to mean differently from that which they have written. But while this is true, still evidence is admissible to show that the contract, notwithstanding the common meaning of the language used, was in fact made in reference to the usage in the trade to which the contract relates. *Smith* v. *Wilson,* 3 Barn. & Adolph. 728. The rule of law is well expressed by Starkie, who has collected the authorities. " Where parties have not entered into any express and specific contract, a presumption nevertheless arises that they meant to contract and to deal according to the general usage, practice and understanding, if any such exist, in relation to

the subject matter. Thus in an action on a policy of insurance, evidence is admissible to show the custom of a particular branch of trade ; for every insurer is presumed to be acquainted with the practice of the trade in which he insures although it has been but recently established, and the usage has existed but for a year." 2 Stark. Ev. 453.

These principles, we think, bear on the case before us. The three policies are all upon the round voyage, to the port of discharge in the United States. The first policy is on ship and cargo, outfits and catchings ; the second is on ship and outfits; and the third is on the cargo and catchings. And the question is, whether the term "outfits," as used in the second policy, covers the catchings, agreeably to the usage which is alleged to exist, that, in an insurance on outfits, catchings are covered to one fourth part of the amount of the outfits. The word "outfits," in its original use, as applying to ships, embraced those objects connected with a ship, which were necessary for the sailing of her, and without which she would not in fact be navigable. It included the sails and rigging, boats and provisions for the ship's crew ; and it has long since been determined that such items enter into the value of the ship, and are covered by an insurance upon her. 1 Phil. Ins. 71, (1st ed.) and authorities there cited. But in ships engaged in whaling voyages, the word has acquired a much more enlarged signification. It has embraced within it not only the ordinary tackle and apparel of the ship, and the provisions for a common voyage from port to port, but the casks and staves, the fishing gear, and the stores and clothing necessary for the successful prosecution of such voyages ; articles not for sale, like a common outward cargo of a ship, but for consumption and use during a protracted voyage of years, and for the storing of the cargo or catchings to be obtained. These outfits have their value ; and they are converted, either indirectly or directly, into cargo, by their consumption and use in procuring the cargo, and by the taking of the casks for the reception of the oil. In consequence of this, a usage has arisen, in the adjustment of losses with

underwriters, by which the catchings have been substituted in the place of outfits, to a limited and reasonable extent, and which custom, in New Bedford — the leading port in the world in the great whale fishery — has been introduced into and become a part of the written contract in their policies, to prevent any question as to the binding nature of the usage. " Outfits " is a word, then, of originally limited meaning, as applied to different trades, and in its application to vessels ; but it has acquired an enlarged meaning, in the hands of merchants engaged in whaling voyages, adapted to their growing trade ; and, as thus used, " outfits " is a word not so clearly defined and strictly limited in its import, nor is it of that plain and decisive character, that we are required necessarily to hold that it is used in policies without reference to an existing custom in this important branch of trade, or that the parties using it intended to confine its application to the outfits as they existed when the ship left her port of departure, and which were changing their character, every day, by consumption and use. The contracts of insurance are inartificial instruments, and the common policy, as used in whaling voyages, is, as to many of its provisions, in no wise applicable to the subject of this particular species of insurance. We are therefore called upon, by the nature of the contract and the character of the extensive trade to which it relates, to give it a liberal construction, in order to do justice between parties. And in view of the subject, as presented to us, we are of opinion that such a usage is reasonable, and that evidence of the existence of it is admissible. Unless the parties shall agree upon the matter, it is to be submitted to a jury to inquire into the existence of such a usage, and whether the parties contracted in reference thereto ; and the inquiry will be, whether the usage is general to all who are concerned in the trade, or whether it is a local usage, and confined to the ports of the Commonwealth ; and if local, whether the merchants and underwriters in Nantucket and Boston are conversant with it, and practise upon it. And if the jury shall find that such usage is general, or, if local, is in force among the

31 *

persons engaged in the trade, as owners and underwriters, in Nantucket and Boston, as well as at New Bedford, and that it enters into the construction of their contracts, when the word " outfits " is used without explanation, as extending to a portion of the catchings ; then the policy effected at the Suffolk office will be held to extend to the catchings, in ascertaining the loss to be paid by these defendants.  But if the custom is limited to the port of New Bedford, or is not well known or established in Nantucket and Boston, then it cannot be admitted to affect the construction of the defendants' policy, or to lessen the amount of their contributory share of the loss.

A question has also been started, and may be necessary to be settled, whether the word " cargo " includes within its meaning the outfits, as well as the catchings ; and also how far the policy at the Ocean office extended to catchings, while the outfits, sufficient in amount to cover the amount at risk, remained on board the vessel.  These are important questions.  The word " cargo " is not of such common occurrence in English policies of insurance as with us.  They use, in lieu thereof, the words " goods and merchandize." But " cargo " is a word of a large import, and means the lading of the ship, of whatever it consists ; and we see not, *in principle,* why it may not cover the outfits, which are goods of value, as well as the " catchings," which is the technical word that includes the blubber taken on board, the oil and the casks.  But whether it should be so applied is not free from doubt, because the word " outfits " is so generally used to express the outward lading ; from which it may be reasonably inferred that the word " cargo " is limited by the parties to the catchings of the ship.  But on this point we do not now feel called upon to express an opinion ; as the case may again come before us, when the facts shall be more clearly settled by the further agreement of the parties, or the verdict of a jury.  We do not see reason to confine the construction of the policy at the Ocean office to the " outfits," after there have been catchings obtained, until the outfits, to the amount of the sum insured, are exhausted ; otherwise, the plaintiffs,

if no other policy had been effected, would have suffered to a certain extent, if not wholly, their catchings to remain unprotected ; which surely was not the design of the contract.

Unless the parties agree, the cause will be sent to a jury, to ascertain the existence of the custom alleged by the defendants, and its nature and extent, as herein stated.