Tuesday,
April 4.

GARRIGUES *against* COXE.

Upon an insurance "at and from," the warranty of seaworthiness must be referred to the commencement of the *risk;* and if between that time and the sailing of the vessel she becomes unfit for sea without the fault of the assured, and is afterwards lost, the assured may recover.
A policy upon vessel contained a clause, that if

THIS was an action upon a policy of insurance for 600 dollars, upon the brig *Malleville* valued at 2000 dollars, at and from *Cape Francois* to *Philadelphia*. The policy was effected on the 11th *December* 1801, and contained the following special memorandum. " If the above vessel, after a regular " survey, should be condemned for being *unsound or rotten*, " the underwriters shall not be bound to pay their subscrip- " tions upon this policy." The declaration set forth, that on the 11th *November* 1801, while the brig was proceeding on her voyage, she sprung a leak, and was by and through the mere danger of the seas, greatly damaged; so that she was obliged to return to *Cape Francois*, and was there found unfit to proceed, and that it would cost more to repair her than she was worth; whereupon she was sold at public auction, and produced only 242 dollars 50 cents.

The cause was tried before the chief justice, at a nisi prius in *March* last, when the following facts appeared in evidence. The *Malleville* sailed from *Philadelphia* the 23d

after a regular survey she should be condemned for being *unsound* or *rotten*, the underwriters should not be bound to pay their subscriptions. *Held*, that the survey and condemnation must shew unsoundness from *decay*, and not from accident; and therefore the clause is not a bar, if the survey shews that the unsoundness proceeded from the gnawing of rats.

A leak occasioned by rats, without the neglect of the captain, is a peril within the policy.

*September* 1801, and arrived at *Cape Francois* the 12th *October.* On the 10th *November* 1801, she sailed upon the voyage insured; and on the next day, without any bad weather, sprung a leak, in consequence of which she put back, and arrived at the *Cape* the 15th. After her cargo was taken out, a survey was held upon her on the 20th, by order of the *tribunal de premiere instance;* and the surveyors reported, that they had caused four streaks of plank to be taken from her waist, from stem to stern on both sides, and found that they were in a bad situation at the load water line, as well as the ribs and timbers, which had been *eaten by the rats*, and were totally unfit to receive the nails for replacing the planks. They recommended several repairs, which they estimated would cost about 600 dollars; but thought that the captain should not incur the expense, until by another survey it should be ascertained that the brig required no others. The report was confirmed, and another survey ordered, which was held on the 30th. The surveyors then reported, that they had ripped off part of the waist plank, and found the plank and timbers to be very inferior; that, upon finding this, they thought it useless to continue ripping, having already seen sufficient to prove that the brig was in so bad a state, that the necessary repairs would exceed her value when repaired. They therefore recommended an abandonment of the vessel, and that she should be condemned and sold at public auction for the benefit of the concerned. This report also was confirmed, the vessel condemned and sold, and the net amount sales 242 dollars 50 cents. One of the surveyors, whose deposition was read upon the trial, swore that on the first* survey they could not find the leak. On the second, they directed some of the outward planks to be taken off, and part of her ceiling to be opened, and they found eight timbers so much rat-eaten, as not to hold nails to replace the plank; but *from their general state, they were not so defective*, except from being eaten by the rats, *as to render her unfit for sea.* He was of opinion that the leak which caused her return, was produced by the rats gnawing her timbers, and principally her outward plank, *and not from any rottenness;* that she might have been repaired in the *United States*, but that at *Cape Fran-*

1809.

GARRI-
GUES
*v.*
COXE.

---

* The survey here spoken of, was probably a survey held on the 17th *November*, when the surveyors could discover nothing, the cargo being still on board.

*cois* the carpenters asked 2000 dollars. He thought however, that it was impossible the impression by the rats could have been made after she left the *Cape, or in less than three or four weeks;* that from the appearance of the holes and rat nests, the rats must have been there still longer; and that she was not seaworthy at the time of the second survey, or when she left the *Cape.* He afterwards saw her at *Havanna,* in the possession of a person who had brought her from the *Cape,* laden with salt, having merely put in five new timbers, and renewed some of the outward plank, to patch her up for the voyage. Another witness also saw her at *Havanna,* where she was hove down. He swore that her bottom was sound, though her sheathing was wormeaten; that from any thing that appeared she was seaworthy, and he should not have been afraid to sail in her. That she there received no other repairs but a new sheathing, which cost 450 dollars; and that she then brought a cargo of molasses in safety to *Philadelphia.*

Upon this case the defendant's counsel opposed the claim, 1. because the vessel was proved not to have been seaworthy *at the time of sailing* from *Cape Francois,* which was the point of time to which the warranty of seaworthiness applied; or, at least, that having proved her unseaworthiness at that time, it threw upon the assured the proof that she was seaworthy when the risk commenced. 2. Because the survey and condemnation were a bar under the special memorandum. 3. Because the eating of rats was not a peril within the policy.

The Chief Justice charged the jury, 1. that the insurance commenced as soon as the vessel had been safely moored twenty-four hours at *Cape Francois;* and that the implied warranty of seaworthiness must be referred to the same time. If between the commencement of the insurance and the sailing of the vessel, she became unfit for sea without the fault of the plaintiff, and was afterwards lost by the perils of the sea, the plaintiff was entitled to recover. 2. With regard to the construction of the policy, he said, that unless the survey shewed that she was *unsound* or *rotten,* he did not think the plaintiff was barred of recovery by force of the policy *only.* As for instance, a vessel might be so disabled as not to be worth repairing, in consequence of sudden accidents, such as loss of masts, breaking of her timbers by accident, without any decay of the wood. As to unsoundness by *decay,* it might be very reasonable

to agree that the survey should be sufficient evidence of the state of the vessel at the commencement of the risk; but such agreement would be very absurd, if applied to injuries arising from sudden accidents and the like. If the survey should say she was *unsound and no more*, the plaintiff would be barred. But if the whole survey taken together shewed a defect arising from an accident, and not from decay, he thought the case would be different, and that the plaintiff would not be barred. Upon the last point his Honour said, that supposing the leak to have been occasioned by the eating of rats, he was of opinion that it was a risk within the policy.

The jury found for the plaintiff, seven hundred and twenty one dollars damages.

*Burd*, for the defendant, moved for a rule to shew cause why there should not be a new trial, upon the ground of a misdirection to the jury; and also because the verdict was contrary to evidence. And in support of his motion, he now made the three points upon which the cause was argued at nisi prius.

Upon the first, he contended that the implied warranty of seaworthiness was coeval not with the risk, but with the sailing of the vessel. There is in the contract of insurance an implied agreement, that every thing shall be in that condition in which it ought to be, *Park* 220, and of course *when* it ought to be; because what should be its condition, must be judged of with relation to the time when the condition becomes material. Upon an insurance " at and from," it is not necessary to have a crew in port, or cables and anchors at the wharf; for that alone which is material in these situations, respectively, is warranted, and she is portworthy without crew or cables. But seaworthiness, strictly speaking, is a capacity to bear the ordinary perils of the voyage; it has no reference to any place but the sea, nor to any time but the sailing; and it is therefore the instant she sails on her voyage, that this warranty attaches, because it is only then that it becomes material. If the warranty, in a policy " at and from," attaches at the beginning of the risk, the insurance is void if at that time she is receiving repairs; and there can be no recovery though she is seaworthy at the time of sailing. But the case of *Forbes* v. *Wilson*, (a) is

(a) *Park* 229. 5th edit. note

flatly the other way. In *Eden* v. *Parkinson*, (a) lord *Mansfield* said it was sufficient if the ship was tight, stanch, and strong, *at the time of sailing;* so in *Shoolbred* v. *Nutt*. (b) The decision in the case of the *Mills* frigate, went upon the same ground. *Marshall* 372.

But the jury were wrong, whichever way the point be. We proved her not to be seaworthy at the time of sailing; and the facts raised a violent presumption that she was not so at the commencement of the risk. The plaintiff gave no evidence to rebut it, though the burden of proof was on him; for the existence of a leak immediately after sailing, and without bad weather, threw upon him the proof of her seaworthiness when the risk commenced. *Marsh*. 365, *Park* 221.

In the second place, he argued that the survey and condemnation were a flat bar. The surveyors report that the brig was in so bad a state, *mauvais etat*, that her repairs would cost more than she would be worth when repaired. This is the very phrase to indicate unsoundness. 1 *Valin* 657, 1 *Emerig*. 583.

Upon the third point, he contended that no damage except by the act of God, that is, inevitable accident, could be considered a peril of the sea. Perils of the sea are such accidents as human prudence cannot guard against; *Park* 61, *Marsh*. 416; for if they can be guarded against, it is *laches* and negligence, and the remedy is against the party in fault, and not against the insurer. *Poth*. *on Ins*. 66. *sec*. 64., 2 *Valin* 79. *art*. 28. The question then is, whether the eating of rats is not chargeable to the captain's neglect. *Dale* v. *Hall*, (c) is in point. There a hoyman undertook to carry goods from one port to another; and the rats made a leak in the hoy, whereby the goods were spoiled. It was held to be negligence in the hoyman, and he answered the damage. Sir *William Jones* puts it upon the footing of ordinary negligence; *Jones on Bail* 104; and the rule laid down by *Roccus*, and adopted by others, that the captain shall be excused if he has cats on board, is itself an illustration of the principle. *Abb*. *on Ship*. 159., *Marsh*. 157., 1 *Emerig*. 377. Here there was no evidence of an endeavour to expel them from the brig. But whether or not the captain is excused, this is not a peril of the sea. It is clearly much less so than the eating of a ship's bottom by worms, which are a creature

(a) *Doug*. 708.      (b) *Park* 229. *a*.      (c) 1 *Wils*. 281.

of the element, and increase its danger. But they were held not to be a peril of the sea, in *Rohl* v. *Parr.* (a)

*Hallowell* and *Ingersoll* for the plaintiff. The risk upon the brig commenced the 13th *October*, twenty four hours after her arrival at the *Cape*. Her condition at that time was left to the jury, and they were warranted in presuming her to have been seaworthy, because she carried out a cargo in safety, and the evidence fixed the injury to a subsequent day. We agree that from the circumstances of the leak, the burden of proof was on the plaintiff; but when it appeared that the loss might be attributed to an unforeseen misfortune, the *onus probandi* was shifted to the defendant. *Patrick* v. *Hallet.* (b) The question is then, whether seaworthiness at the commencement of the risk is sufficient upon an insurance " at and from." The argument on the other side proceeds upon a mistake in not distinguishing between an insurance " from," and an insurance " at and from." When lord *Mansfield* says, it is sufficient if a vessel be seaworthy at the time of sailing, and that if she sail without, there is no valid policy, he is evidently speaking of an insurance " from," where the time of sailing is the commencement of the risk; and so he is understood by *Park* 228 *b. note*. But there is not a dictum in existence, that upon an insurance " at and " from," the vessel need not be tight and strong when the risk commences. If she need not, a loss in port might be recovered under the policy, though it arose from the defect of the vessel. If then the vessel must be and is in a proper condition when the policy attaches, and by a peril insured against, she is prevented from being so at the time of sailing, to vitiate the policy on account of unseaworthiness at sailing, is to defeat it by one of its own perils. The case of the *Mills* frigate (c) is decisive. The objection to that vessel was that she was not tight, stanch, and strong. Mr. *Park* says, that the judgment for the assured turned upon this, that " the evidence did not pre-" cisely prove that the ship was not seaworthy *at the time of the* " *insurance taking place on the* 1*st* April 1764, *on her arrival at* " Nevis, but only that she was so *at the time of her sailing* on " the 26th *July*. And the court unequivocally declared that a " ship that is not, *at the commencement of the insurance*, in a fit

(a) 1 *Esp.* 444.　　　(b) 1 *Johnson* 248.　　　(c) *Park* 228. 5th *edit.*

1809.

GARRI-
GUES
v.
COXE.

"condition to perform her voyage, is not a fit subject for insu-
"rance." In *Forbes* v. *Wilson* the underwriters took a ground
directly opposite to the defendant's; they contended that she
must be ready for sea when the policy attached; but the answer
to that is, that it is not necessary that she should be ready for
sea, but she must be sound.

A survey and condemnation have no effect under the me-
morandum, unless they proceed upon the rottenness and un-
soundness of the vessel in the nature of decay. The reason of
the stipulation is evident. When the timbers perish from natu-
ral decay, it may be impossible to fix whether the unsoundness
was produced by the voyage, or before. The insurers have
cleared themselves of the difficulty. But where the unsound-
ness may easily be brought home to a peril within the policy,
the reason fails. Here the condemnation was in consequence of
the eating of rats, and the difficulty of getting repairs. The sur-
vey says she was *en mauvais etat*, but not *pourri*, *gaté*, or *cor-
rompu;* and a witness swore that her bottom was sound, and
that with an expense of 450 dollars, she brought a heavy cargo
to *Philadelphia.* If the defendant sets up a flat bar, he must
bring his case within the very words of the clause; it will not
answer even if the condemnation assign a mixed reason, as un-
soundness, and the want of docks to repair. *Watson* v. *Ins. Co.
N. A. (a)*

A leak is a peril insured against, and the only question is
whether it is excepted out of the general perils of the sea,
when it is occasioned by rats. The underwriters are answer-
able for every accident at sea, not attributable to the fault of
the owner or master. The liability of vessels to the depredation
of rats, is perfectly well known; no human prudence can pre-
vent these animals from making their entry; and the injury
here was inevitable, because it was unforeseen. The case of
*Dale* v. *Hall* was between a hoyman and his customer; and
the law between these parties can form no rule for the con-
tract of insurance. The hoyman is discharged by accidents
that bind the underwriter, and *vice versa.* The one contract is
governed by rules of public policy, the other by the intention
of the parties. The case however stands alone; it is not sup-
ported by prior authorities, nor has it been since recognised

(a) *Cir. Ct. U. S. Penn. Dist.*

in any judicial decision. [C. J. TILGHMAN. My mind at the trial rested simply on the abstract point, whether, supposing the captain not to have been in fault, this was such an injury as the underwriters must answer for.] There was not a shadow of evidence that the captain was in fault. Then as to *Rohl* v. *Parr:* It turned upon an understanding among the merchants of *London*, that the eating by worms upon the voyage insured, was not within the policy. The whole was left as a fact to the jury. If it decided a principle of law, we deny its authority; it is in direct opposition to the opinion of *Emerigon*, and the case of the *King Solomon*, referred to by him. 1 *Emer.* 587.

*Levy* in reply. Unseaworthiness is such a state of the vessel, as, without reference to the possibility or impossibility of avoiding it, renders her unfit for her destined voyage. When is it material to the contract that the warranty should be true? Not when the vessel is in harbour. She may be receiving repairs. The policy nevertheless covers her, if it be " at and " from;" and of course the warranty cannot then attach, for she has nothing like seaworthiness about her. There is no getting away from the case of *Forbes* v. *Wilson*. It was an insurance upon a ship " at and from" *Liverpool*, which at the time the policy was made, was not in a condition to go to sea, but was undergoing material repairs. Lord *Kenyon* held that under the words " at and from" it was sufficient if the ship was seaworthy at the time of sailing, for from the nature of the thing the ship while *at* the place, probably must be undergoing some repair. If it is sufficient then, so it is material. The warranty cannot bind as to the assured at one time, and as to the insurer at another. The inconveniences of the principle are nothing; but they would be all the greater, if the warranty attached with the risk. A vessel may arrive at a foreign port, with a leak that cannot be stopped in twenty-four hours. The policy is void. She may be struck with lightning the day she arrives; it takes a week to repair her, and she then sails seaworthy, and is lost: there can be no recovery. And so in many others. There has been no proof however, that the brig was sound at the commencement of the risk; and the plaintiff should have been held to strict and cogent proof, after such a loss. *Marsh.* 367. It did not appear in what condition she landed her outward cargo. From the depositions, it was probable the rats were in her at

1809.

GARRI-
GUES
*v.*
COXE.

GARRI-
GUES
*v.*
COXE.

1809.

that time, and had given her a death blow. Upon such evidence the jury had no right to presume seaworthiness; and as there are other causes upon this policy, we should be sent back to investigate this matter further.

As to the memorandum: the timbers were reported to be unsound and rotten; they would not hold the nails, and she was condemned for this cause. We therefore do bring ourselves within the words of the clause. The cause of the defect is of no consequence; the parties have not said that it is; and as in the common case of a warranty, it is therefore immaterial. Rotten and unsound however, mean different things; they embrace all causes. I do not agree the case of *Watson* v. *Ins. Co. Nor. Am.*, that if by the survey and condemnation she is brought expressly within the memorandum, the assignment of additional causes will take her out.

Upon the last point it has been conceded, that the insurers are not answerable for the neglect of the master. The case of *Dale* v. *Hall* is express that the gnawing of rats is ordinary negligence; no matter between what parties, or upon what contract. It is held not to be inevitable accident, and that is enough.

The opinion of the court was delivered by

TILGHMAN C. J. In this cause, as in many others, we feel the loss of our brother *Smith.* As the cause was tried before me, it was not my intention to give any opinion, but in case of necessity. It has now become necessary. I shall only say, however, on the points of *law*, that I have found no reason to alter the opinion delivered on the trial; and in that opinion judge *Brackenridge* concurs with me. The law being settled, the merits of the case rest on the facts, whether the vessel was in proper condition at the time the injury from the rats took place, and whether this injury took place before or after the commencement of the risk insured against, and without the neglect of the captain. To these points the parties gave very little evidence on the trial, nor did their attention seem to have been turned towards them. All the proof made by the plaintiff was that the vessel performed her *outward* voyage in good time; but as to her condition, or the condition of her cargo, there was *no evidence.* It appears that there are several more actions depending on the same policy; and now that it is understood, on

what points the cause turns, it may be expected that the merits will be more fully investigated. The court are of opinion that it will be most conducive to justice to hold the present case under advisement, till a trial is had in one of the other actions. If the jury find again for the plaintiff, there will be no reason for a new trial in this case; but if a verdict shall be given for the defendant, it will be proper to grant a new trial, unless the parties themselves agree on some other arrangement.

*1809.*

*Garri-
gues
v.
Coxe.*

YEATES J. took no part in the cause, being related to one of the parties; but he said at the conclusion of the court's opinion, that he was perfectly satisfied with it.

*Cur. adv. vult.*