## Fleming *against* The Marine Insurance Company.

## New Trial.

In order that a protest may be evidence for the insured, it must be made within twenty-four hours after the vessel is moored on her arrival at her port of destination, or certainly before the goods have been landed, or the condition of the cargo ascertained.

If the extension of the protest be delayed till afterwards, the mere noting the protest within the twenty-four hours would not make it evidence.

The naked fact shown by the insured that the goods after arrival were found damaged by sea-water, is not evidence of a loss from a peril of the sea.

THIS was a motion for a new trial, in an action of covenant, brought by Joseph Fleming against the Marine Insurance Company, tried before Mr Justice Sergeant, in which a verdict was rendered for the plaintiff.

The declaration stated a valued policy in the usual form, for account of whom it might concern, dated the 16th January 1827, in the name of Joseph Fleming, on goods, lost or not lost, in the sum of $5000, on board the brig Seneca, in her voyage from New York to Havana. It contained an averment that the insurance was made by order and per account of John Macia, who was interested to the whole value, and that the loss was occasioned on the 8th February 1827, by the violence of the winds and waves. The plaintiff showed a bill of lading signed Henry D. Levely, of the goods, shipped in good order and well conditioned, by Joseph Fleming to Don Baltazar Mitjans, at Havana, seven cases of merchandise, viz: ribbons, plush, velvet, and an invoice of the same. Mitjans's deposition proved the entry and receipt of these goods at Havana, for Macia, and that some of them arrived damaged — wet outside and inside. On his cross-examination, he stated he saw part of the goods three or four days after the arrival in of the brig: they were on the quay. That a deduction of duty was claimed and allowed.

The plaintiff then read the depositions of the persons in New York who had sold the articles to Macia, at different periods prior to the shipment, (some as much as two years,) to show that they were sound and in good order when sold and delivered to him. Other depositions were read, stating that the goods were examined at Havana at the instance of the consignee, after they were landed and in the custom-house stores; and some of the witnesses said they were wet inside and outside, and they believed, or it appeared that they had been damaged by sea-water. Some of these witnesses were custom-house officers. Others stated they

[Fleming v. The Marine Insurance Company.]

were wet, but could not say whether they were damaged from sea-water. The examinations by some of these witnesses took place after the goods were taken to the auction stores, to which they were sent, and were sold at a very reduced price as damaged goods. The plaintiff also gave in evidence a deposition showing that other goods imported into Havana in the Seneca, on that voyage, consisting of cotton, with Cologne, knives and forks, &c., were wet, but the loss was not of sufficient importance to claim a reduction of duties.

During the trial, the plaintiff offered in evidence the following protest of Captain Lively and the mate and one other of the crew, at Havana, noted on the 20th February 1827, and extended on the 9th March 1827.

" By this public instrument of protest, be it known and made manifest to all whom it doth, may or shall concern. That on the day of the date hereof, before me, S. M. Rodney, Consular Commercial Agent of the United States for the city of Havana, personally came and appeared Henry Lively, master of the brig Seneca, belonging to the port of New York, in the State of New York, of the burthen of 305 66-95 tons, or thereabouts; also, Edward Monteith, mate of said brig, and William Hunt, of and belonging to the brig aforesaid—who being severally sworn, did declare and depose, that the said brig being laden with a cargo of furniture and dry-goods, they, the said appearers, made sail in and upon the said brig from the port of New York, bound to the Havana, on the 30th day of January, in the year 1827. That in the prosecution of the voyage, nothing material occurred until the 31st day of January last past, which commenced with thick, hazy weather; at half-past one, the pilot left us; middle part light airs and clear, latter part heavy gales; took in all sail, except the close reefed main-topsail and fore-topmast-staysail. And that on the first day of February last past begins with stormy gales from the north-west; at 2 P. M. set the reefed foresail and close reefed fore-topsail; at 6 A. M. more moderate; at 7 let the double reef out of the topsails; latter part fine and pleasant weather. And that on the third day of said month of February commenced with thick cloudy weather; at 1 P. M. fresh breezes, take in the light sails and mainsail, double reefed the fore and main topsail, and reefed the trysail; latter part fresh gales from the south and westward. And that on the fourth day continues with strong gales; latter part more moderate. And that on the sixth day of said month, begins with strong breezes from the south and westward; at 8 P. M. double reefed the fore and main topsails, took in the jib and reefed the foresail. Midnight strong gales and clear weather; latter part more moderate. And that on the eighth day commences with fine breezes. Midnight fresh breezes and clear; at 3 A. M. the breeze increasing, took in topgallant-sail, mainsail and jib; latter part the gale increasing,

III.— 19　　　　　N

[Fleming v. The Marine Insurance Company.]

close reefed the fore-topsail, and handed it, double reefed the main-topsail, and balanced reefed the trysail. And that on the 19th day of said month, at 10 A. M. came-to with the stream anchor off the Moro. And that on the 20th day of February reached the city of Havana, when the first named deponent came on shore, within twenty-four hours thereafter, and noted protest to be extended as is now done.

And the said appearers did further severally declare, that the said brig at the time of her departure from New York aforesaid, was tight, staunch and strong; had her hatches well and sufficiently calked and covered; was well and sufficiently manned, provided and furnished with all things needful and necessary for said voyage; and during the said voyage the said appearers and ship's company used their utmost endeavours to preserve the said brig and the goods of her loading from damage. And, therefore, the said Henry Levely did declare to protest as by these presents he doth solemnly protest, against all and every person or persons, whomsoever it may or shall concern; and doth declare, that all damages, losses, and detriments, that have happened to the said brig, and the goods of her loading, are, and ought to be borne by the merchants and freighters interested, or by whomsoever else it may or shall concern, (by way of average or otherwise); the same having occurred, as before set forth, and not by or through the insufficiency of the vessel, the neglect of him the said appearer or appearers, or either of the other mariners or seamen belonging to the said brig.

All which matters and things were declared, alleged, and affirmed before me the said Consular Commercial Agent; and, therefore, I have hereunto set my hand and affixed the seal of my office, being requested to certify and testify the premises.

Thus done and protested, at the city of Havana, this 9th day of March 1827."

To the admission of this in evidence the defendant objected, and the Judge overruled it.

The plaintiff offered to show by witnesses, the practice of the commercial world as to the noting and extending of protests, with a view to offer the protest again. This evidence was objected to by the defendant, and overruled by the court.

To show that the policy was made on Macia's account, the plaintiff called Horace Binney, Esq., who had brought this action, to prove that previous to this suit, Fleming told him the interest in the policy was in Macia. This was objected to by the defendant, but admitted by the court. Mr Binney stated, that Fleming, the first time he came to see him, told him the interest was in Macia, who was then absent; afterwards Macia brought him a paper, and from that time he never saw Fleming. Macia was a Spaniard. In consequence of the change, and by the directions of Mr Binney, a paper was drawn up for his security, which

[Fleming v. The Marine Insurance Company.]

(being admitted in part after being objected to,) was a note from Fleming to Mr Binney, endorsed 1st August, stating that he had no interest in the result, and that the proceeds when received belonged to Macia, whose instructions he would obey in regard to the suit. Some other evidence was given to show Fleming was the agent of Macia.

The defendant then gave in evidence the following deposition of Captain Levely, taken at Philadelphia, on the 9th of April 1828:

Henry Levely, of the city of New York, shipmaster, a witness on behalf of the defendants, being duly sworn according to law, on his oath, saith; that he commanded the brig Seneca, on a voyage from New York to Havana, which commenced the latter end of January 1827; that the said brig sailed from New York on the 30th of January, and arrived at the Havana on the 19th of February; that they experienced head winds, but no very heavy weather during the passage; that before the cargo was unladen, and before the hatches were taken off, the deponent called on Captain Robert M. Hamilton, master of the schooner Mary Hogan, of Baltimore, and Joseph Dougherty, master of the brig Francis, of New York, to survey the hold of said brig; that they attended, and were present at the opening of the hatches, and, upon examination, found the cargo properly stowed and dunnaged; that the only appearance of damage, on the survey, was upon some boxes of tea, one barrel of beef and a bundle; that the tea came on board in bad order, the tops off, head broke, and it was evident, as to that, that it had sustained no damage whilst on board, and of that, the consignee was himself satisfied; that the beef was jerk-beef, put up in New York, not properly cured, and had suffered nothing from sea damage; that the bundle contained a settee, and the only damage to that was, its being broken by the stevedore.

That during the delivery of the whole of the cargo, the deponent was wholly unapprised of any other damage to any part of it, except what he has mentioned before, and that he received his full freight for it, without any claim for damage, excepting for the settee, and for some boxes of cider which had been broken.

That on his arrival, he noted his protest, but saw *no occasion* to extend it, as he considered himself to have suffered no damage; that ten or fifteen days after his arrival, he was applied to by the consignee of the plaintiff's goods, Mr Mitjans, to extend his protest; he then stating, for the first time, to deponent, that the goods had suffered damage. That deponent at first declined, stating to him that it was not necessary, as all the goods had turned out in good order; but, on his repeating his solicitation, and offering to pay the expenses, deponent agreed; and he sent on board the clerk of the commercial agent, Mr Rading, who made out the protest from the log-book, and deponent, being sick with the rheumatism, signed it on board. That the consignee never requested the deponent to examine the goods, nor offered to show them to him.

[Fleming v. The Marine Insurance Company.]

That the goods were landed from the vessel, on the wharf, and taken to the custom-house, which was distant not more than 50 or 60 feet from the vessel. That the goods were opened in the custom-house, and the consignee might, without any trouble, have exhibited the goods to deponent. • That the plaintiff's goods were placed under the half-deck, which was the safest place in the vessel, where they were least exposed to any wet or any damp. *That the deponent saw them on the wharf, when they came out, and to all appearance, they were in perfect order*—and deponent thinks in as good order as if they had been in the cabin of the vessel. That no goods stowed near to them suffered any damage, to his knowledge. And it is the firm belief of this deponent that the said goods of plaintiff suffered no damage whilst they were on board of the vessel.

Being cross-examined, the deponent says; the tonnage of the Seneca was 306 tons, or thereabouts. Her cargo on the voyage to the Havana, was assorted, consisting of pitch, tar, rosin, cider, apples, and dry-goods. She was not full, but about two-thirds full. He had but about $600 freight out. He does not know that there were any dry-goods on board, except those consigned to Mitjans; and he does not now recollect the number of boxes there were of them. He was not present at the lading of the cargo in New York. He was confined to his chamber, but came down once or twice when they were taking it. The dry-goods he found, one morning, on coming down, that the mate had stowed them in a bad place, and he had them removed. The deponent was able to do duty on the voyage, but after he discharged his cargo he was taken sick. His first officer was James Banks; he superintended the landing of the cargo. By the custom or law of the port, cargo must be landed before ten o'clock in the morning. The dry-goods, consigned to Mitjans, were landed from eight to ten, and soon after taken to the custom-house. It is the rule to send all dry-goods to the custom-house. Mitjans might have seen the boxes, while on the wharf, and he might not. Goods are sometimes put in the custom-house stores and kept four or five days or a week, before they are looked at. What the state of the custom-house at the time was, he does not know. The deponent had nothing to do with collecting his freight—the list was handed to his consignees, who saw to the collection. The dry-goods were put under the half-deck, which runs from the mainmast aft. The teas were stowed along with them—all the boxes were stowed in the same place. As soon as her cargo was out, the brig hauled into the stream—and two or three days after the deponent was taken sick, and was confined altogether to his berth. He does not think the dry-goods of plaintiff were on board more than six days before the brig sailed, and they were landed two days after the arrival; that is, on the third or fourth day after arrival.

To disprove the averment of interest in Macia in the policy,

[Fleming v. The Marine Insurance Company.]

.the defendants gave in evidence a valued policy, effected 17th January 1827, in the Phœnix Insurance Office, on goods by the Seneca, by Joseph Fleming. In that policy the goods were warranted American. A suit was brought on this policy, and it was agreed, after a correspondence with the plaintiff's counsel, stating there was no known difference in the cases, it should abide the decision of the case of *Fleming* v. *The Marine Insurance Company.* Afterwards, the Phœnix Company, alleging they had discovered a difference in the cases, desired a separate trial and separate defence, which the plaintiff refused.

The plaintiff then again offered in evidence the protest abovementioned. The defendant objected to it generally, and also that it could only be received to discredit Capt. Lovely. But it was admitted as rebutting evidence.

The judge charged the jury, that they were to decide on the averments in the declaration, to wit: that a policy was made, that the interest in it was in Macia; the shipment of the goods as laid, and the damage by the perils of the sea. The defendant alleged, that the policy was not made for the benefit of Macia, and that the goods were not damaged in the course of the voyage, or, if they were, it was not by perils of the sea. They also contended, that the goods were not properly dealt with at Havana, and were sold at an irregular sale. That the whole was a fraud of Macia, contrived by him to dispose of goods that were unsaleable. These were left to the jury to decide.

The following reasons were now filed why there should be a new trial:

1. A letter endorsed, received 1st August 1828, to Horace Binney, Esq., the counsel for the plaintiff, from Joseph Fleming, was admitted in evidence, (and the objection thereto was overruled,) omitting a part thereof.

2. The answers of Juan Giraud and others, under a commission to Havana, were admitted, although the answers to the interrogatory were indirect and evasive.

3. The protest, as it was called, of the captain, mate and one seaman, was admitted in evidence generally on the part of the plaintiff, after the defendants had given in evidence the deposition of Captain Henry Lovely.

4. The verdict is totally unsustained by evidence, there being no proof whatever that any injury was sustained by the cargo or any part of it on the voyage, and there being positive and uncontradicted testimony the other way.

5. There was no evidence whatever of injury at any time to the goods insured.

6. The averment of interest in John Macia in the declaration, was disproved for all the purposes of this suit, by the warranty in the policy, (and order,) of the Phœnix Insurance Company of

[Fleming v. The Marine Insurance Company.]

American property, and the agreement and assertions of the identity of the claims.

7. There were no facts from which the legal inferences could be drawn of interest in John Macia, or of damage to the goods by the perils of the sea.

8. The whole proceeding on the part of the plaintiff was fraudulent — the necessary facts being proved without contradiction — and the legal inference being inevitable of fraud and covin.

9. The treatment of the goods after their arrival at Havana, and the conduct of the consignee there in departing from the regulations of the custom house, and procuring the nominal protest, were fraudulent and did away all rightful claim.

10. The learned judge did not, in charging, give due weight to the transactions with the Phœnix Insurance Company — to the absence of proof of damage on the voyage — to the absence of proof of ownership near the time of shipment of the goods — to the irregular and fraudulent character of the sale of the goods at Havana, and of the mode of obtaining the protest — and to the total absence of all proof of perils of the sea.

11. The defendants were liable by the contract of insurance only for extraordinary perils, and it was proved without contradiction that none such had occurred.

12. The verdict is, at first blush, extravagant, and the result of prejudice and passion rather than of reason and judgment.

*J. Sergeant,* for the defendants, argued at large on the facts of the case, but principally insisted that the protest ought not to have been received in evidence, unless it was for the purpose of contradicting Captain Levely's deposition, and then only to discredit him; the consequence of which was, that the plaintiff failed to show that the loss or damage was occasioned by the perils of the sea. Indeed, for all that appears, it may have been owing to sea-water thrown upon the goods after their arrival at Havana, or to the leakage of the vessel; and where damage happens without any adequate cause, the presumption is, till the contrary is shown, that the vessel was unseaworthy. *Union Ins. Co.* v. *Prescott,* (1 *Whart.* 399). The protest does not show that the goods were damaged during the voyage. It does not state any disaster, any heavy seas shipped, or spars lost. The whole voyage was propitious. The jury, therefore, had no evidence to proceed upon in finding a verdict for the plaintiff; and to submit a case to a jury without evidence, is erroneous. But the admission of the protest was general, and as evidence of the facts stated in it, it was inadmissible. It is not received as evidence in any other court in the United States or England; and in Pennsylvania it has been narrowed down to confined limits, and will not be further extended. 1 *Dall.* 8, 10; 3 *Binn.* 228; 8 *Serg. & Rawle* 549. The paper here is not a protest, as it states no injury, and was not done on

[Fleming v. The Marine Insurance Company.]

arrival, but delayed for upwards of two weeks, and was not made out on the captain's own motion, but at the instigation of the consignee.

*J. Randall* and *J. M. Scott, contra,* contended that there was sufficient evidence in the protest and the depositions, to show a loss by the perils of the sea, which mean the violence of the winds and waves, tempest, lightning, rocks, and other natural causes, whether usual or extraordinary. *Hughes on Insurance,* 214, 256; 1 *Phill. Ins.* 249. Even the deposition of Captain Lovely, in saying there were no *heavy* gales, shows there were some gales. He noted a protest on arrival; a survey on stowage and dunnage was made; every witness says the goods were then wet, though sent on board sound. The damage by sea-water apparent on arrival, is *primâ facie* evidence that it occurred during the voyage, and by the perils of the sea. Whatever may be the rule elsewhere, it has been the constant practice in Pennsylvania to read the captain's protest in evidence; and in this instance it was noted on arrival, the 21st of February, and extended on the 9th of March, which is sufficient. 1 *Dall.* 6, 10; 1 *Yeates* 201; 1 *Dall.* 317: 1 *Binn.* 40; 3 *Binn.* 227; 1 *Wash. C. C. Rep.* 147. If the protest was admissible at all, it was so for every purpose.

The opinion of the Court was delivered by

Gibson, C. J.—The only material questions raised by these reasons for a new trial, are: Was the master's protest properly rejected in the first instance; and was there, without it, any evidence at all to support the allegation of loss from a peril of the sea? In all beside, the reasons are either immaterial or unfounded.

That a mariner's protest is competent evidence of the facts set forth in it on the trial of an insurance cause, is an anomaly peculiar to the law of our own state; for it is elsewhere only one of the preliminary proofs of loss which the assured is bound, by custom or the terms of the contract, to furnish the insurer before compensation can be demanded. And it is one which has its root in an imperfect note of an erroneous decision of this court at a time when its bench was not occupied by judges bred to the law. I believe that neither of the judges who ruled the point in *Nixon* v. *Long,* (1 *Dall.* 6), had been admitted to the bar; yet their decision, wrong as it palpably is, has been followed till it has become too deeply seated in precedent to be abruptly eradicated. This is remarkable; because the error was not merely speculative, but mischievous in practice. A protest is an act of the master and some of his people, all of whom are answerable to the owners for negligence, where it has existed; and it is consequently their interest to saddle the insurers with the consequences of it. In any circumstances, therefore, it is a dangerous sort of evidence; and the principle of *Nixon* v. *Long,* if not overruled, must be

restrained to protests regularly made. But the course to be pursued on the vessel's arrival at her port of destination, has not been particularly defined. It has been said by Mr Weskett, under the head of protest in his digest of the law of insurance, that this document had become, in his day, a matter of form in which it was the practice to recite any foul weather that had been experienced, and any trifling sea that had been shipped, on a supposition that it was necessary to do so in order to free the master from liability for contingent damage to the cargo—certainly no very great recommendation of a protest as an instrument of legal proof. Originally the practice was to protest in 24 hours after the vessel was moored; and in this instance the protest was noted within that time, but it was not extended till the 17th day, when it was decisively too late. The act bears date on that day, and as a whole it is referrible to no other; for it is a mistake to suppose that a protest noted in time may be extended at any time afterwards. The better opinion seems to be, that it must be made, and consequently completed, if not within the 24 hours, yet certainly before the goods have been landed, or the condition of the cargo has been ascertained. Such, at least, was the ordonance of France, which precluded the master from alleging, after delivery of the goods, any other accidents than those mentioned in his protest; and which, as it tended to lessen the master's temptation to collude with the consignee, seems to have been founded in principles of general jurisprudence. The noting of a protest, therefore, must not be taken for the material part of it, because it would still leave the framing of it open to be influenced by the condition of the goods when sent on shore. The practice seems to have originated in the port of London, where shipmasters seldom did more in the first instance than have their intention to protest noted, or entered as they at first called it, before a notary public, instead of giving notice, according to the practice of Hamburg, to the consignees, importing a fear that the cargo was injured, and inviting them to inspect the stowage of it before it should be discharged. Such is the origin ascribed to the practice of noting by the writer already quoted; and it is obvious that it is open to be abused. In the instance under consideration, the master swears that the extension was procured from him, against the dictates of his judgment, by the importunity of the consignee. As, then, the act of protest was not concluded till the goods were landed, it was properly rejected as a document to show the cause of the loss; and was there any other proof to supply its place?

The sum of the evidence is, that the packages were found to be wet in the custom-house store; and the legal presumption of innocence negatives the gratuitous imputation of foul play by the consignee and custom-house officers. The bill of lading, too, is *primâ facie* evidence that the goods were taken on board in good condition: so that the question is, whether the naked fact that they

[Fleming v. The Marine Insurance Company.]

were damaged by the contact of sea-water, is evidence of a loss from a peril of the sea within the meaning of the contract.

From the language of the books, it would seem that an opinion has sometimes been entertained that there is a distinction between those perils which are extraordinary, and those which are only ordinary. A loss by an immediate act of God, such as a tempestuous state of the weather, or by unforeseen causes, such as shoals or collision, which human sagacity or force could not prevent, certainly belong to the former; but such as happen when the elements are propitious and in a clear sea, have been thought to be excluded from the range of the policy. But this distinction, if it ever existed, has been nearly, if not altogether, obliterated by the later cases in which it has been held that any damage from the immediate impulse of the winds or the waves, in whatever degree of excitement, is a proper subject of indemnity; for instance, damage from collision even by the negligence of those who had the injured vessel in charge. Still, may not a cargo become wet with sea-water by the agency of causes with which the winds and waves have no connexion? The contact may be produced by bad stowage, defective calking, imperfect closing of the hatches, or want of pumping, to say nothing of rat-holes, which in *Garrigues* v. *Coxe*, (1 *Binn.* 592), and in no other case, have been classed with perils of the sea; and damage from any of these but the last, must, by our law, be compensated by the master or the owners. It is expressly said by Mr Marshall in his treatise on insurance, (*b.* 1, *ch.* 6, § 4), that the master and owners are liable for damage from exposure of the goods to wet: that is, as I understand it, exposure by negligence, but not by an opening of the ship's seams from straining in a storm or on a shoal. But it certainly assumes that damage may be done by sea-water without constituting a loss by a peril of the sea within the meaning of the policy. Now it was not sufficient for the plaintiff to establish a loss which might, or might not, have proceeded from such a peril. It was necessary distinctly to set forth, in his declaration, the accident which was the cause of the loss, and it was consequently necessary to trace it, by proof, distinctly to the peril alleged. So far is this carried, that a ship is always presumed to have been defective when she sailed, unless her disability be proved to have been occasioned by the perils of the voyage. (*Marsh. b.* 1, *ch.* 11, § 1). A doubt seems to have been entertained as to the fitness of the principle in its application to the circumstances of the case which gave rise to it; but it seems not to have been doubted, that when a ship, which has not been disabled in her voyage by an accident or stress of weather, is found unable to reach her place of destination, there is a presumption that she was unseaworthy when she sailed, which it is incumbent on the assured to disprove; and the presumption ought equally to hold in a case of damage from a leak not shown to have been caused by any accident or force insured against. What

III. — 20

[Fleming v. The Marine Insurance Company.]

proof, then, have we that these goods were not damaged by the contact of sea-water occasioned by bad stowage, want of pumping, or defectiveness of the vessel.? We have not a particle of evidence that violence was done to the hull, or that the brig had lost a tack or a spar; and without it, the presumption is that the loss is referable to some one of the causes just mentioned. In that state of the case, there was nothing for the jury to do but find a verdict for the defendant.

New trial awarded.